UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | Criminal No. **19 CR 605** |
| v. | § § | UNDER SEAL |
| ARTHUR NATHANIEL BILLINGS (1), JEREMY BRANCH (2), DEANNA MICHELLE WINFIELD-GATES (3), FRANK COOPER (4), and DONNA ELAINE HOOPER (5), | § § § § § § § | United States Courts Southern District of Texas FILED AUG 2 2 2019 David J. Bradley, Clerk of Court |
| Defendants. | § | |

**INDICTMENT**



Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

    a. Oxycodone was classified as a Schedule II controlled substance. Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

    b. At all times relevant, and as of October 6, 2014, Hydrocodone was classified as a Schedule II controlled substance. Prior to October 6, 2014, Hydrocodone was classified as a Schedule III controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

    c. Alprazolam was classified as a Schedule IV controlled substance. Alprazolam, a benzodiazepine sometimes prescribed under brand name Xanax, was a medication used to treat anxiety and was highly addictive.

    d. Carisoprodol was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive.

    e. Promethazine with codeine cough syrup was classified as a Schedule V controlled substance and was highly addictive.

5. It was well known that combinations of high-dose opioids, including oxycodone and hydrocodone, and one or more of carisoprodol, alprazolam, and promethazine with codeine, significantly increased the risk of patient intoxication and overdose. Moreover, prescribing these drugs together often created a significant risk of diversion because, prescribed together, they were often highly abused and sought for a non-legitimate medical purpose due to the increased "high"

a user may experience from taking hydrocodone or oxycodone along with one or more of the others.

6.      Accordingly, for a treating physician to prescribe the combination of high-dose opioids and any benzodiazepine, carisoprodol, and/or promethazine with codeine syrup for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7.      Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe or distribute controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8.      Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9. Chapter 21 of the Code of Federal Regulations, Section 1306.06 governed the filling of prescriptions and provided: "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy, a registered central fill pharmacy, or registered institutional practitioner."

10. All prescriptions for controlled substances must be "dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II is prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

11. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") up until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). Pharmacies were required to report to the PMP all controlled substances dispensed, including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

12. TSBP Rule 291.29 related to the Professional Responsibility of Pharmacists, and instructed a pharmacist to make every reasonable effort to ensure that any prescription drug order has be issued for a "legitimate medical purpose by a practitioner in the course of medical practice."

4

13.     TSBP Rule 291.29(c) provided reasons to suspect that a prescription may have been authorized in the absence of a valid patient–practitioner relationship or in violation of the practitioner's standard of practice, including:

   a.   a disproportionate number of patients of the practitioner receive controlled substances;

   b.   the manner in which the prescriptions are authorized by the practitioner or received by the pharmacy;

   c.   the geographical distance between the practitioner and the patient or between the pharmacy and the patient;

   d.   knowledge by the pharmacist that the patient has exhibited doctor-shopping or pharmacy-shopping tendencies.

14.     When pharmacies obtained a pharmacy license, TSBP distributed to pharmacies a document called: "Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF…," which largely mimicked TSBP Rule 291.29(f). The document identified the following "red flags," among others, related to non-therapeutic dispensing of controlled substances:

   a.   the pharmacy dispenses a reasonably discernible pattern of substantially identical prescriptions for the same controlled substances, potentially paired with other drugs, for numerous persons, indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

   b.   the pharmacy operates with limited hours of operation or closes after a certain threshold of controlled substance prescriptions are dispensed;

   c.   prescriptions by a prescriber presented to the pharmacy are routinely for controlled substances commonly known to be abused drugs, including opioids, benzodiazepines, muscle relaxants, psychostimulants, and/or cough syrups containing codeine, or any combination of these drugs;

   d.   prescriptions for controlled substances are commonly for the highest strength of the drug and/or for large quantities (e.g., monthly supply), indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

  e. dangerous drugs or over-the-counter products (e.g., multi-vitamins or laxatives) are consistently added by the prescriber to prescriptions for controlled substances presented to the pharmacy, indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

  f. the practitioner's clinic is not registered as, and not exempted from registration as, a pain management clinic by the Texas Medical Board, despite prescriptions by the practitioner presented to the pharmacy indicating that the practitioner is mostly prescribing opioids, benzodiazepines, barbiturates, or carisoprodol, but not including suboxone, or any combination of these drugs;

  g. the controlled substance(s) or the quantity of the controlled substance(s) prescribed are inconsistent with the practitioner's area of medical practice;

  h. the Texas Prescription Monitoring Program indicates the person presenting the prescriptions is obtaining similar drugs from multiple practitioners, and/or that the persons is being dispensed similar drugs at multiple pharmacies;

  i. person's pay with cash or credit card more often than insurance;

  j. your pharmacy charges and persons are willing to pay more for controlled substances than they would at a nearby pharmacy;

  k. sporadic and non-consistent dispensing volume (including zero dispensing) varies from day to day, and week to week; and

  l. your pharmacy routinely orders controlled substances from more than one drug supplier.

## ENTITIES AND DEFENDANTS

15. HEALTH FIT PHARMACY, LLC ("HEALTHFIT") was a community pharmacy located at 1307 Yale St. #H Houston TX 77008. HEALTHFIT became registered with the DEA as a retail pharmacy on November 10, 2009, to handle Schedule II-V controlled substances under DEA Number FH1729942. HEALTHFIT was registered with the Texas State Board of Pharmacy ("TSBP") with license number 26701.

16. **ARTHUR NATHANIEL BILLINGS ("BILLINGS")** owned (through **PERSON A**) and operated HEALTHFIT, where he was a pharmacist, licensed by the Texas State Board of Pharmacy, license #32324.

17. **JEREMY BRANCH**, licensed by the Texas State Board of Pharmacy, license #52469, was pharmacist-in-charge ("PIC") at HEALTHFIT from in or around February 2017 to in or around September 2017.

18. **FRANK COOPER**, licensed by the Texas State Board of Pharmacy, license #36431, was a relief pharmacist at HEALTHFIT.

19. **DEANNA MICHELLE WINFIELD-GATES**, licensed by the Texas State Board of Pharmacy, license #36558, was a relief pharmacist at HEALTHFIT.

20. **DONNA ELAINE HOOPER**, licensed by the Texas State Board of Pharmacy, license #225071, was a pharmacy technician at HEALTHFIT.

<u>COUNT ONE</u>
**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

21. Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

22. From in or around January 1, 2014 through in or around January 1, 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**ARTHUR NATHANIEL BILLINGS,**
**JEREMY BRANCH,**
**DEANNA MICHELLE WINFIELD-GATES,**
**FRANK COOPER, and**

**DONNA ELAINE HOOPER,**

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with others known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally unlawfully distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other controlled substances, outside the usual course of professional practice and not for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## Purpose of the Conspiracy

23. It was a purpose and object of the conspiracy for the Defendants, and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

## Manner and Means of the Conspiracy

The manner and means by which the Defendants sought to accomplish the purpose and object of the conspiracy included, among other things:

24. Dispensing dangerous drugs and cocktails of drugs, to include oxycodone, hydrocodone, alprazolam, carisoprodol, and promethazine with codeine syrup, mostly to

individuals brought to HEALTHFIT with illegitimate prescriptions—including those under a physician's credential's without that physician's knowledge;

25. To maintain the appearance of legitimacy, HEALTHFIT, through **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their co-conspirators both known and unknown to the Grand Jury, would sell pharmaceutical drugs with high street value to individuals posing as patients. These individuals came to HEALTHFIT from "crew leaders"—co-conspirators whose role was finding the "patients," obtaining their prescriptions by whatever means necessary, and paying HEALTHFIT hundreds of dollars in cash for the drugs, including oxycodone, hydrocodone, alprazolam, carisoprodol, and promethazine with codeine syrup (or for combinations thereof), to sell on the black market for profit.

26. The purported prescriptions that HEALTHFIT filled—through **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their co-conspirators both known and unknown to the Grand Jury, demonstrated a gross lack of individualized care for the purported patients: the vast majority of these prescriptions were for oxycodone 30mg, alprazolam 2mg, hydrocodone 10/325mg, and carisoprodol 350mg, the most potent dosage strengths of these drugs, and were for same or substantially similar dosage units. HEALTHFIT dispensed these drugs in dangerous combinations, often along with promethazine with codeine, because they had high street value. Defendants knew these highly addictive and dangerous combinations of drugs, sometimes diverted as the "Houston cocktail," were prescribed outside the usual course of professional practice and with no legitimate medical purpose.

27. In this and other ways, **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their HEALTHFIT co-conspirators both known and unknown to the Grand Jury, used their statuses as a licensed pharmacies, pharmacists, and technicians, and, where

individuals brought to HEALTHFIT with illegitimate prescriptions—including those under a physician's credential's without that physician's knowledge;

25. To maintain the appearance of legitimacy, HEALTHFIT, through **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their co-conspirators both known and unknown to the Grand Jury, would sell pharmaceutical drugs with high street value to individuals posing as patients. These individuals came to HEALTHFIT from "crew leaders"—co-conspirators whose role was finding the "patients," obtaining their prescriptions by whatever means necessary, and paying HEALTHFIT hundreds of dollars in cash for the drugs, including oxycodone, hydrocodone, alprazolam, carisoprodol, and promethazine with codeine syrup (or for combinations thereof), to sell on the black market for profit.

26. The purported prescriptions that HEALTHFIT filled—through **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their co-conspirators both known and unknown to the Grand Jury, demonstrated a gross lack of individualized care for the purported patients: the vast majority of these prescriptions were for oxycodone 30mg, alprazolam 2mg, hydrocodone 10/325mg, and carisoprodol 350mg, the most potent dosage strengths of these drugs, and were for same or substantially similar dosage units. HEALTHFIT dispensed these drugs in dangerous combinations, often along with promethazine with codeine, because they had high street value. Defendants knew these highly addictive and dangerous combinations of drugs, sometimes diverted as the "Houston cocktail," were prescribed outside the usual course of professional practice and with no legitimate medical purpose.

27. In this and other ways, **BILLINGS, COOPER, HOOPER, WINFIELD-GATES,** and **BRANCH**, and their HEALTHFIT co-conspirators both known and unknown to the Grand Jury, used their statuses as a licensed pharmacies, pharmacists, and technicians, and, where

applicable, their DEA Registration Numbers, to dispense the controlled substances named. In return, they were rewarded with cash for the drugs in amounts well over the market value of legitimate prescriptions for the drugs.

All in violation of Title 21, United States Code, Section 846.

<div align="center">

### COUNTS 2-4
**Money Laundering**
**(18 U.S.C. § 1957)**

</div>

28. Paragraphs 1 through 20 and 24 through 27 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

29. On or about the dates specified below, in the Houston Division and elsewhere in the Southern District of Texas, Defendant

**ARTHUR NATHANIEL BILLINGS**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly engage in monetary transactions within the United States by, through, and to, a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such funds having been derived from a specified unlawful activity that is drug diversion in violation of Title 21, United States Code, Section 841, in the transactions alleged below:

| Count | Defendant | On Or About Date | Transaction | Dollar Amount |
|---|---|---|---|---|
| 2 | BILLINGS | 3/20/17 | Withdrawal by Check No. 1019 from Mutual of Omaha account held in the name of Health Fit Pharmacy LLC, with an account number ending in 2464, to MBK Auto Group | $22,500 |
| 3 | BILLINGS | 10/5/17 | Withdrawal by Cashier's Check No. 376589 from Mutual of Omaha account held in the | $10,516.49 |

|   |   |   | name of Health Fit Pharmacy LLC, with an account number ending in 2464, to KLG Ironwork, LLC |   |
|---|---|---|---|---|
| 4 | BILLINGS | 9/25/17 | Withdrawal by Cashier's Check No. 376569 from Mutual of Omaha account held in the name of Health Fit Pharmacy LLC, with an account number ending in 2464, to Duomo Iron Doors | $10,516.49 |

All in violation of Title 18, United States Code, Section 1957 & Title 18, United States Code, Section 2.

## COUNT 5
### Conspiracy to Commit Laundering of Monetary Instruments
### (Violation of 18 U.S.C. § 1956(h))

1. Paragraphs 1 through 20 and 24 through 27 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2. From on or about January 1, 2014 to on or about January 1, 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, Defendant

**ARTHUR NATHANIEL BILLINGS**

did willfully and knowingly combine, conspire, and agree with **PERSON A**, and other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, that is, to knowingly conduct attempt to conduct financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, that is, distributing a controlled substance in violation of 21 U.S.C. § 841, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and with the intent to conceal the

carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i)

All in violation of Title 18, United States Code, Section 1956(h).

## NOTICE OF CRIMINAL FORFEITURE
## (21 U.S.C. § 853(a))

30. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants, that upon conviction of an offense in violation of Title 21, United States Code, Section 846, the following is subject to forfeiture:

   a. all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

   b. all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

## NOTICE OF CRIMINAL FORFEITURE
## (18 U.S.C. § 982(a)(1))

31. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to Defendant

### ARTHUR NATHANIEL BILLINGS

that in the event of conviction of a money laundering offense in violation of Title 18, United States Code, Sections 1956(h) or 1957, all property, real or personal, involved in a money laundering offense or traceable to such property, is subject to forfeiture.

### Specific Property Subject to Forfeiture

32. The property subject to forfeiture includes, but is not limited to, the following:

(a) The real property, including all improvements, buildings, structures and appurtenances, legally described as:

Lot Twenty-four (24) in Block Three (3) of SIENNA VILLAGE OF ANDERSON SPRINGS, SECTION EIGHT (8), a subdivision in Fort Bend County, Texas, according to the map or plat thereof recorded in Plat No. 20080026 of the Plat Records of Fort Bend County, Texas.

### Money Judgment and Substitute Assets

33. The United States will seek the imposition of a money judgment against each Defendant upon conviction.

34. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each Defendant up to the amount of the money judgment against that Defendant.

A TRUE BILL

Original Signature on File

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING CHIEF, HEALTH CARE FRAUD UNIT
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE